Horace Maynard, Special Judge,
delivered the opinion of the Court.
Sometime prior to 1854, Jacob Ellis, the testator of complainants, sold a tract of land to Wright, giving him a bond for title, upon the payment of the purchase money. In November of that year, Wright sold the same land to Scott. A balance of $800.00, was still due of the purchase money from Wright to Ellis. For this sum, Scott executed to Wright two notes for $400.00, each, at one and two years, with interest from date, and specifying, on their face, the consideration — “in part of' *317 the land and mill property on which said Wright now lives.” These notes, Wright assigned to Ellis, who executed to Scott a deed for the land. A payment of $800 was subsequently made upon one of the notes. In August, 1857, Scott sold the land- to Carter.
Some few years prior to this time, it seems that Scott had been indebted to the late Thomas L. Williams, in the sum of one thousand dollars, and had given him his note, with Johnson and Temple security. On the 9th of September, 1857, Scott, then in his last sickness, placed a note on Carter for one thousand dollars, due the first of October following, in the hands of Johnson, as the latter says in his receipt executed to Scott, “to secure the said Temple and myself from the payment of said note to said Williams.” Scott died not long afterwards, and Temple administered upon his estate. The insolvency of the estate was suggested in the County Court, and complainants filed the two notes, as creditors, for their ratable portion of the assets.
Nothing further appears to have been done, until October, 1858, when Carter executed a power of attorney to confess judgment in the Circuit Court of Greene County, upon the note placed by Scott in the hands of Johnson for the indemnity of himself and Temple. Upon the judgment so obtained, execution was issued and levied upon the said tract of land, which was sold in April, 1859, to Johnson and Temple, for the debt and costs. So the matter stood at the filing of this bill, on the 6th of May, 1859, and up to the 31st of January afterwards, when Johnson filed his original answer. Carter neglected to answer^ and died with a judgment pro eonfesso stand *318 ing against him. The suit was not revived against his heirs, hut against his administrator, upon whose motion the judgment pro confesso was set aside, and he admitted to answer, which he did in November, 1860. In September, 1861, Temple filed his answer, and made known the fact that “the representatives of Carter has redeemed the land,” — whether the administrator or the heirs, the record does not disclose.
Upon this state of facts several questions arise: 1st, Did Ellis retain a lien upon the land in the hands of Scott, for the payment of the two notes executed by him to Wright, and afterwards assigned to Ellis ? The vendor’s lien upon the estate, sold for the payment of the purchase money, has been a subject of much inquiry both in England and in this country.
Mr. Sugden defines it as follows: “Where a vendor delivers possession of an estate to a purchaser without receiving the purchase money, equity, whether the estate be or be not conveyed, and although there was not any special agreement for that purpose, and whether the estate be freehold or copyhold, gives the vendor a lien on the land for the money:” 3 Sugden on Vend. and Purch., 183.
Lord Eldon states it thus: “The settled doctrine is, that where the vendor conveys, without more, though the consideration is, upon the face of the instrument, expressed to be paid, and by a receipt indorsed upon the back of it, if it is the simple case of a conveyance, the money, or part of it, not being paid, as between the vendor and vendee, and persons claiming as volunteers, though, perhaps, no actual contract has taken *319 place, a lien shall prevail, in the one case, for the whole consideration; in the other, for that part of the money which was not paid:” Mackreth vs. Symmons, 15 Vesey, 337.
Chancellor Kent holds this language: “The vendor of real estate has a lien, under certain circumstances, on the estate sold, for the purchase money. The' vendee becomes a trustee to the vendor for the purchase money, or so much as remains unpaid. This equitable mortgage will bind the vendee and his heirs, and volunteers, and all other purchasers from the vendor, with notice of the existence of the vendor’s equity. Prima facia, the lien exists without any special agreement for that purpose, and it remains with the purchaser to show, that, from the circumstances of the case, it results that the lien was not intended to be resumed:” 4 Com., 152.
The statement of the doctrine by Mr. Story is somewhat fuller: “The vendor of land has a lien on the land for the amount of the purchase money, not only against the vendee himself, and his heirs and other privies in estate, but, also, against all subsequent purchasers, having notice that the purchase money remains unpaid. To the extent of the lien, the vendee becomes a trustee for the vendor; and his heirs and all other persons claiming under them, with such notice, are treated as in the same predicament. This lien of the vendor of real estate for the purchase money, is wholly independent of any possession on his part, and it attaches .to the estate as a trust, equally, whether it be actually conveyed, or only be contracted to be conveyed.
*320 “The principle upon which Courts of Equity have proceeded in establishing this lien in the nature of a trust, is, that a person who has gotten the estate of another, ought not, in conscience, as between them, to be allowed to keep it, and not pay the full consideration money. A third person, having full knowledge that the estate has been so obtained, ought not to be permitted to keep it without making such payments, for it attaches to him as a matter of conscience and duty. It would otherwise happen that the vendee might put another person into a predicament better than his own, with full notice of all the facts:" Eq. Jur., 580-582.
This Court holds, that, “this equity of the vendor will be sustained against the vendee, and all claiming through or in privity with him, and likewise against volunteers and purchasers with notice:" Green et al. vs. Demoss et als., 10 Hum., 375.
A distinction has been taken between the case of a conveyance and a mere contract for a conveyance. In the latter, the vendor holds the title, as mortgagee, for the security of the purchase money. The Court say, in the case of Graham vs. McCampbell, Meigs, 56: “We are not able to draw any sensible distinction between the cases of a legal title conveyed to secure the payment of the debt, and a legal title retained to secure the. payment of a debt; for, in both cases, Courts of Chancery consider the estate only as security for the payment of the debt, upon the discharge of which the debtor is entitled to a conveyance in the one instance, and a re-conveyance in the other.”
*321 Applying these principles to the case before us, it follows, that, before the conveyance to Scott, Ellis held the title of the land, as mortgagee, to secure the unpaid purchase money due from Wright. Did he, when he changed the evidence of the debt, making Scott the primary ob-ligee, and conveyed to him the land, intend to waive his lien upon the land for security? The presumption is that he did not, and there is no proof to the contrary. On the other hand, the evidence is plenary, that he intended to retain the lien; and while accommodating Wright, he thought he was, at the same time, making his debt still more secure: Dishmore vs. Jones, 1 Coldwell, 554.
2d, Did the lien of Ellis follow the land after the sale by Scott to Carter ? To protect a purchaser from a vendor against the lien of a prior vendor, he must have purchased the estate, and paid for it in full, without notice of the lien; and this defense he must make, either by plea, or by answer as specific as a plea. Carter, we have seen, made no defense. His administrator has not made the defense in his answer. On the contrary, a memorandum left by his intestate, and appended to his answer, admits that when Scott sold him the land, “it is true, he told me he had paid all for the property but three hundred dollars.” To one of the witnesses, he said that “Scott told him the property was all paid for but about four hundred dollars.” But whatever his information at the time of the purchase, the proof is clear that he had full notice of Ellis’ lien before he had paid for the property, and that he contemplated legal proceedings *322 to stop enough of his purchase money to discharge it. It follows, then, that the lien attached to the land in Carter’s hands, and descends with it to his heirs.
3d, Does the lien of Ellis take precedence of the claim of Johnson and Temple ? This question is authoritatively settled by this Court, in the case of Green et als. vs. Demoss et als., 10 Hum., 376. It is held that the vendor’s lien “cannot be allowed to prevail against creditors of the vendee, who had subsequently acquired a lien upon the estate, whether with or without notice, either by judgment or in any other mode, before a bill has been filed by the vendor to assert his lien. This equity, though it relates to the date of the conveyance, does not acquire the character or effect of a specific lien upon the property, until the filing of a bill to enforce it. Hence, as between the vendor and subsequent lien creditors of the vendee, it becomes, essentially, a question of priority of liens, irrespective of notice and all other considerations.” In short, since Johnson and Temple, by their judgment and execution, levy and sale, asserted their claim and fixed it specifically upon the land, they may, with good conscience, hold their advantage of priority. And they will be allowed to retain, out of the proceeds of the note on Carter, hypothe-cated for their indemnity by Scott, so much — and so ■ much only — as they have been compelled to pay as his security upon the Williams note, after it has been credited with its ratable share in the assets of Scott’s estate. To ascertain the amount, an inquiry will be ordered.
*323 4th, Did the complainants waive their testator’s lien, by proceeding to secure their available share in the es. tate of Scott ? It is a familiar principle, that where one of two creditors may resort to either of two funds, and the other to but one of them, equity will compel the former to exhaust that to which the latter has no access, before going upon that which is accessible.to both. This principle, it is conceived, would have compelled the complainants to exhaust their remedy against the personal assets of Scott, before going upon the land in the possession of Carter or his heirs: Pollexfen vs. Moore, 3 Atkins, 272, and comments on the case; 3 Sugden on Vend. and Purch., 206. And even if complainants could not have been compelled by Carter and his heirs, to marshal their securities, it is certainly no objection against them that they have done so.
The result, then, is, that complainants are entitled to recover the amount due upon the two notes given by Scott to Wright, and assigned by him to their testator, to be paid from the assets of his estate until exhausted, then from any balance remaining with Johnson’s administrator and Temple, that may be found by the inquiry already directed; and the remainder out of the land. But, because the heirs of Carter are not before the Court, their rights in the premises will not be prejudiced by the decree; and the cause will be remanded to the Chancery Court, with leave to complainants to make said heirs parties, and to take an account in conformity with the principles here announced.
The costs should properly have fallen upon the estate *324 of Scott; but as that estate is insolvent, and to change it, -would, in effect, be to onerate his other creditors, they will be equally divided between complainants, Johnson’s estate, and Temple and Carter’s estate.